[L. A. No. 17037. In Bank.—March 30, 1940.]

In the Matter of the Estate of CHARLES A. GAINES, Deceased. FREDERICK ANDREWS, Coexecutor, etc., Appellant, v. CALIFORNIA TRUST COMPANY (a Corporation), Coexecutor, etc., Respondent.

J. B. Irsfeld, Douglas Fawcett and James B. Irsfeld, Jr., for Appellant.

Eckman & Lindstrom, as *Amici Curiae*, on Behalf of Appellant.

George E. Farrand and Edward W. Tuttle for Respondent.

Dryer, Castle & Richards, as *Amici Curiae*, on Behalf of Respondent.

GIBSON, J.—This is an appeal by Frederick Andrews, co-executor of the estate of Charles A. Gaines, from a decision of the probate court after trial of issues arising upon exceptions to the accounts of the executors. The purpose of the proceedings was to determine the title to certain personal property comprising bank accounts, corporate stock, promissory notes and a few other items of personal property.

The decedent, Charles A. Gaines, was the great uncle of appellant Andrews. Gaines came to California in 1918 with a substantial fortune. In 1923 he established an office in Los Angeles where he took care of his property and investments. Appellant, who lived in Ohio, for some years saw his uncle only on visits, but in October of 1933 came to California where he operated a small business and saw him frequently. He performed a few personal services for decedent, but did not transact any business for him, nor did they discuss the estate.

In January, 1934, decedent went to the Seaboard Bank and there procured a form of joint ownership contract covering a safe deposit box. The bank clerk at this time explained the nature of the contract and the effect of the survivorship clause. Decedent signed the card, and later requested appellant to come with him to the bank and put his signature on it. Appellant testified he could not recall any definite conversation taking place at that time, but declarations made by him prior to the trial, as well as his testimony show that he believed that his uncle was merely arranging for him to have access to the safe deposit box in order to make it easier to handle the estate.

Appellant did not see the box itself at this time. He knew nothing about its contents until some months later, when, at his uncle's request, he put some papers into it and noticed some Gillette Safety Razor Company stock there. Appellant never used the box himself, paid no rent on it, never inquired as to its contents, received none of the income from the stock kept therein and in short, in his own language, "never gave a thought to it" from the time he signed the card until some months after his uncle's death.

In September, 1934, decedent again called upon appellant to go with him to the bank. This time he signed joint tenancy cards for two bank accounts. Appellant testified that there was no special conversation about the purpose of the signing but respondent offered evidence of declarations made by appellant, indicating that he understood decedent's purpose was to facilitate the handling of the estate after his death. However, when decedent obtained the cards, their nature and effect were explained to him by bank employees.

In December, 1934, appellant went back to Ohio to live. Previous to this he gave his safe deposit key to his uncle. In October, 1936, his uncle died, and respondent California Trust Company, coexecutor under his will, delivered to appellant an envelope found in the decedent's safe and addressed to appellant. The envelope contained the latter's safe deposit key and a letter reading as follows:

"Dear Freddie:

"Enclosed please find the key to my safe deposit box in the Seaboard Nat. Bank, Hollywood Blvd. at Whitley, which is in our joint names, said box contains most of my securities, stocks, deeds, etc. from my bank account which is in the name

of my wife and self you can draw checks for your and her allowance as provided by my will, all other beneficiary payments to be held up until my estate is settled. You can immediately get in touch with California Trust Company, coexecutor and start work on settling the estate. Sincerely, Uncle C. A. Gaines.''

Thereafter appellant participated in various conferences with officers of respondent trust company and its attorneys, at which time the will and its provisions were considered and plans for the administration of the estate discussed. During these conferences appellant repeatedly expressed the opinion that his uncle did not intend that the property should go to him individually. When the parties opened the safe deposit box and took out the contents, appellant permitted them to be held by respondent trust company, which was the special administrator, and respondent collected the income from the stock and included all of the contents of the safe deposit box in its account as special administrator, with no objection from appellant. Proceedings in administration thereafter went on in the usual manner.

In March, 1937, appellant, who had previously been represented together with the trust company by one firm of attorneys, retained new counsel to represent him individually. With the appointment of his new counsel appellant for the first time made a personal claim to the bank accounts and the safe deposit box as a surviving joint tenant. In order to test his right, a suit for declaratory relief was brought by appellant against respondent California Trust Company, but this was voluntarily dismissed after decision upon demurrer, on the ground that the probate court had exclusive jurisdiction. The issue was then raised in the following manner: Respondent California Trust Company filed its account as coexecutor and charged the executor with those items of personal property, namely, the bank accounts and the contents of the safe deposit box. Appellant took exceptions to the account asserting his claim of ownership to this property. Appellant filed his account as coexecutor in which he did not include this personal property, but set forth his claim of ownership. To this account respondent filed its exceptions. Thus the issue of title to the property was raised. Later by amendment to its exceptions to conform to proof, permitted over objection by appellant, respondent set forth the specific

contention that there was never any intention on the part of decedent to make a gift of the property but that the parties entered into the arrangement merely to facilitate administration of the estate after the death of the decedent.

After trial the probate court decided in favor of respondent and against appellant on the issue presented. The court specifically found that decedent had made the arrangement for the signing of the joint tenancy cards for both the safe deposit box and the bank accounts merely for the ease and convenience of appellant as executor in obtaining possession of the property and administering it; that it was not intended thereby to make a gift to appellant of the property or money; and that it was the intention and understanding of both parties that if appellant survived the decedent he would take and hold all of the property in trust for the estate. The issue presented by this appeal is whether these findings are supported by substantial and competent evidence.

█ The joint tenancy cards signed by the parties with reference to both the safe deposit box and the bank accounts would, standing alone, be sufficient to create joint tenancies, that is, joint interest with right of survivorship to the whole. Cases wherein such agreements have been upheld are frequent. (See, for example, *Wallace* v. *Riley*, 23 Cal. App. (2d) 654 [74 Pac. (2d) 807]; *Estate of Fritz*, 130 Cal. App. 725 [20 Pac. (2d) 361]; *Young* v. *Young*, 126 Cal. App. 306, 313 [14 Pac. (2d) 580].) The attack upon the formal writing is based upon the theory that the decedent and appellant did not intend to create a joint interest in property nor did they enter into a contract; but that they merely sought to make a convenient arrangement for access to and handling of the property, or a transfer in trust for the benefit of the persons entitled to the property under the will, and not an absolute gift of the property itself.

The testimony chiefly relied upon was given by officers of respondent trust company, to the following effect: Appellant, after decedent's death, told them that *decedent stated* at the time the cards were signed that this was being done to facilitate handling of the estate after his death. Thus, J. C. Seaman, assistant trust officer, testified that at one conference appellant related that his uncle called him to the bank without telling him the object of the trip, and asked him to sign a safe deposit box card; and that "his uncle had said that he

was fixing things this way to make it easy for Mr. Andrews to administer his uncle's estate, because his uncle had told him that he had made him executor of his last will. We then questioned Mr. Andrews in regard to the bank accounts, and he said they were signed up similarly at later dates, and his uncle had told him that he was fixing the bank accounts the same way as the box, for the same purpose''. The witness further testified as to appellant's story: ''He did not know until he got to the bank, he told us, just what was required of him, but he went along in accordance with his uncle's wishes, and it was only when he was asked to sign the card that his uncle said, 'Fred, I want you to sign this so that you can take care of my affairs after I am gone. You know I told you I have made you executor of my will' ''. B. L. Smith, vice-president of respondent trust company, testified to the same effect.

Appellant gave a different version of these conversations, consistent with his other declarations and conduct. He testified that his uncle made no direct statements of his intention, and that in relating the circumstances referred to he, appellant, was merely offering his own honest belief as to what his uncle probably had in mind. Appellant's bewilderment at his uncle's unexplained actions clearly appears in the testimony of all of these witnesses, and his expressions of opinion seem to be reasonable and natural. But in view of the court's findings, we may, for the purposes of this opinion, accept the version of respondent, and proceed to determine the important question of the admissibility of this evidence.

■ First, it is hearsay, the witnesses testifying to statements made by another. Second, it is offered to prove the fact asserted, that is, the purpose of the joint tenancy agreements; so it is *prima facie* within the hearsay rule and inadmissible unless it comes under one of the exceptions. Third, the witnesses were not testifying to a declaration made to them by decedent, but to a declaration made to them by appellant.

■ It is clear, then, that if the evidence was properly received at all, it came in as an admission. If appellant had told the witness that he, appellant, had entered into the agreement as a matter of convenience in the handling of decedent's estate, and not intending a joint tenancy, this would unquestionably constitute an admission. What appellant actually told the witness, however, was that the decedent had said so.

Ordinarily this type of statement would not be an admission; that is, a statement describing another's declaration is normally not regarded as an admission of the fact asserted by the other. One does not admit everything he recounts or describes merely by reason of the relating of it.

On the other hand, it is equally well settled that there may be admissions other than statements made by the party himself; that is, statements of another may in some circumstances be treated as admissions of the party. The situations are (1) where the person who makes the statement is in privity with the party against whom it is offered, as in the case of agency, partnership, etc.; and (2) where the statement of the other is adopted by the party as his own, either expressly or by conduct. Familiar examples of this second situation are the *admissions by silence,* where declarations of third persons made in the presence of a party give rise to admissions, the conduct of the party in the face of the declaration constituting the adoption of the statement to form an admission. (See 2 Wigmore, Evidence, secs. 1052, 1069, 1071.) ▮ It would seem that in the instant case, when appellant repeated the declaration of decedent without challenging it, it became an admission against him.

This is, however, the only testimony produced by respondent having any substantial tendency to prove an intent different from that expressed in the joint tenancy instruments. An attempt is made to corroborate it by proof of other declarations of appellant, and by the conduct of appellant. The declarations were made to respondent's officers and attorneys, and stated his belief that his uncle had not intended him to have any personal ownership of the property, but that the arrangement was intended solely for convenience of administration. Thus, Mr. Proudfit, of the law firm representing respondent, testified to a conference in his office shortly after Mr. Gaines' death, at which Mr. Smith, respondent's vice-president, explained the problems created by the joint tenancy agreements. Appellant said, according to the witness, "that he knew that his uncle had not intended that for himself individually, but that his uncle had not told him what he did have in his mind; that he felt that his uncle had intended that that money should be used for estate purposes. . . . " Appellant was then told that if he wished to claim the property as his, "he would be in a very strong position". He

answered that "he did not care at all about that because he knew the property was not intended for him; that he did not expect to assert any claim about it, and therefore, whatever his technical rights might be, it was of no consequence to him". The witness then testified to another conference a few days later at which he again raised the question of the possibility of conflicting interests of appellant and respondent, in view of the joint tenancy agreements, and again explained the case that could be made out in support of them. Appellant declared that "there could not be any doubt about it; that this money was not intended for him and he knew such to be the case". Similar testimony was given by Mr. Seaman and Mr. Smith. As to the conduct of appellant, it is pointed out that he did not treat the contents of the safe deposit box as his own, made no claim to the property therein or to its proceeds, and neither asserted nor exercised any rights in the bank accounts; and that after the death of decedent, he participated in numerous conferences and in the business of administration of the estate, always recognizing the property as that of the estate, and making no personal claim thereto until some five months after the death.

Although we have selected the strongest testimony the record offers in this connection, its essential weakness is apparent. With the exception of the statement of the decedent adopted by appellant, which has been discussed above, the declarations consist exclusively of speculations or impressions as to what his uncle had in mind, and legal conclusions of appellant as to his own rights. The evidence of the conduct of appellant is of the same character; he did not "feel" or believe that he had any claim, and therefore did not assert any. It may be observed that appellant testified that he was somewhat concerned about the possible effect of such a claim on his rights as a distributee under decedent's will, in view of the disinheritance clause therein. Regardless of motive, however, neither the declarations just recited nor the conduct of appellant can be said to add any particular strength to the admission discussed above.

The evidence regarding decedent's knowledge of the legal effect of his act in signing the joint tenancy agreements is uncontradicted. Miss Lapic, in the safe deposit department, testified that decedent asked for a safe deposit box, stating that he would like to have appellant sign the contract

with him; that she inquired whether he wanted appellant to sign as agent, or whether he wanted a joint ownership contract; and that she then showed him the two different forms and he selected the joint ownership contract. She also testified that as a part of her regular routine duty she explained that under the latter form, upon death of one party the contents belonged to the survivor. Miss Noyes, a clerk handling new accounts, testified that decedent asked for the proper signature card to make his account a joint one with a nephew, and she gave him the proper card. Mr. Ralston, manager of the bank, testified that he asked decedent if he understood the difference between joint tenancy with right of survivorship and an authority to draw checks on the account; and decedent replied that he did.

This evidence is, of course, highly probative; and if the court had found in favor of appellant, the finding could not have been successfully challenged on appeal. Whether the opposite is true, that is, whether the present finding of the court has sufficient support in the single admission proved against appellant, and discussed above, is a difficult question. It is true that the determination of the intention of decedent from these conflicting statements was the task of the trial court; but it is almost incredible that decedent, a man of considerable business experience, if he did not intend a joint tenancy with right of survivorship, would deliberately choose the joint tenancy card in the face of the explanation given him by the bank employees. If it were necessary to our decision that we decide this point, we would hesitate before holding that proof of the deliberate choice of a writing expressing an intent to transfer property, with full knowledge of its nature and effect, could be overcome by a single statement attributed to decedent and suggesting an undefined purpose of "convenience" in "care" of decedent's estate. But regardless of the strength or weakness of the evidence, it cannot be considered at all unless it can meet the objection of the parol evidence rule.

■ The parol evidence rule, as is now universally recognized, is not a rule of evidence but is one of substantive law. It does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. The rule as applied to contracts is simply that as a matter of substantive law, a cer-

tain act, the act of embodying the complete terms of an agreement in a writing (the "integration"), *becomes the contract of the parties*. The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations. (See Civ. Code, sec. 1625; Code Civ. Proc., sec. 1856; *Harding* v. *Robinson*, 175 Cal. 534 [166 Pac. 808]; *Rottman* v. *Hevener*, 54 Cal. App. 474 [202 Pac. 329]; *Estes* v. *Delpech*, 73 Cal. App. 643 [238 Pac. 1085]; *Hanrahan-Wilcox Corp.* v. *Jenison Machinery Co.*, 23 Cal. App. (2d) 642 [73 Pac. (2d) 1241]; 5 Wigmore, Evidence, sec. 2400, p. 236; 3 Williston, Contracts, sec. 631; Restatement, Contracts, secs. 237–244.)

■ The theory of the trial court seems to have been that it was competent to introduce the evidence discussed above to show that though title passed to appellant under the joint tenancy agreement, it went to him *in trust*. The cases relied upon are those which hold that though a writing purports to make an absolute transfer, extrinsic evidence may be offered of a collateral agreement to hold the property as security, or in trust. (See Wigmore, *supra,* sec. 2437; Williston, *supra,* sec. 635.) This exception to the parol evidence rule is, of course, well settled; and the evidence might be admissible under such a theory, if it established a collateral agreement on appellant's part to hold the property in trust. However the court's finding in general terms of such an agreement is not supported by the record. There is evidence of some vague kind of trust intent and a subject matter; but a specific trust purpose was entirely lacking. Respondent suggests that it might be a "dry" or "passive" trust, or one to convey. But there is no clear showing of an intention to create either of these types, nor was there a designated beneficiary. There is no indication as to what appellant would be required to do if he were held to be a trustee of the property. The record contains suggestions, mostly derived from appellant's own speculations, of an intention to have some payments made, or

some things accomplished with the money; but no specific directions were given by decedent.

The most that can possibly be inferred from the evidence is that the decedent may have intended to create a trust, for some purpose, or for someone's benefit, but failed to disclose that purpose, or the beneficiary, and therefore failed to create the trust. (See *Estate of Ralston*, 1 Cal. (2d) 724 [37 Pac. (2d) 76, 96 A. L. R. 953]; *Wittfield* v. *Forster*, 124 Cal. 418 [57 Pac. 219].) ▆▆ Since the question is one of admissibility of the evidence, the proof of a trust must be clear and convincing before it could be deemed sufficient to overcome the legal effect of the joint tenancy agreements. Here it is wholly inadequate.

▆▆ The argument that appellant may be considered a constructive trustee simply begs the question. If an attempt were made to create a trust and the record showed the basic elements of intent, purpose, and subject matter, but it was unenforceable because of the statute of frauds or some other invalidating cause, the trustee could not keep the property individually, but would be declared a constructive trustee. This result, however, presupposes the establishment of the basic elements of a trust. Here the evidence is wholly insufficient to establish these elements, for the object or purpose of such a trust is entirely lacking. The record does not therefore support respondent's claim that the written transfer in joint tenancy was accompanied by and subject to a collateral trust agreement. The writing creating the joint tenancy remains the sole competent evidence of the agreement between the parties, and respondent's assumption of an unproved trust agreement as the basis for the further assumption of its breach, as ground for imposing a constructive trust, must necessarily fail.

▆▆ It follows that the findings of the trial court cannot be sustained. The evidence clearly establishes that decedent, not acting under fraud or undue influence, and with full knowledge and understanding of the legal effect of his acts, made transfers of personal property to himself and appellant in joint tenancy. The writings effecting the transfers were clear and complete in their terms, and the record does not contain sufficient evidence to bring the case within any of the exceptions to the parol evidence rule.

■ It therefore becomes unnecessary to give extended consideration to the provisions of section 15a of the California Bank Act. (Deering's Gen. Laws, Act 652.) This statute provides that the making of a bank deposit in the form of a joint tenancy with right of survivorship shall be conclusive evidence of the intention of the depositors to vest title in the survivor. The agreement involved herein was made in the form contemplated by the statute, and in the absence of fraud or undue influence, which are recognized as exceptions under the statute, cannot be challenged by other evidence of intent. This statute applies, of course, only to the bank deposit. A question of some interest is raised by respondent as to whether subsequent fraud, consisting of a repudiation of a prior promise to hold the property in trust, may be fraud within the meaning of the statutory exception, on the analogy of cases involving the statute of frauds (see *Notten* v. *Mensing*, 3 Cal. (2d) 469 [45 Pac. (2d) 198]), and the constructive trust cases. (See *Lauricella* v. *Lauricella*, 161 Cal. 61 [118 Pac. 430].) Because the evidence does not show any fraud at all on the part of appellant, we deem it inappropriate to discuss the meaning and effect of the fraud exception to section 15a of the Bank Act.

The judgment is reversed.

Carter, J., Edmonds, J., Shenk, J., and Waste, C. J., concurred.

CURTIS, J., and HOUSER, J., Dissenting.—We dissent. We are unable to agree with the conclusion reached by the majority opinion reversing the judgment in this case. The statement of the appellant, testified to by the witness, J. C. Seaman, as to the purpose of his uncle in executing the safe deposit card and the two joint tenancy bank accounts, was binding upon him, and was clearly admissible to show the intent of the uncle in executing said instruments. (*Fanning* v. *Green*, 156 Cal. 279 [104 Pac. 308]; *Kyle* v. *Craig*, 125 Cal. 107 [57 Pac. 791]; Wharton on Evidence, secs. 482, 508, 955; *Snow* v. *Paine*, 114 Mass. 520, 526; *Barnhart* v. *Fulkerth*, 93 Cal. 497, 499 [29 Pac. 50].) In the case of *Kyle* v. *Craig*, *supra*, p. 114, it is stated that, "It is earnestly contended that the court erred in allowing Bright to testify, under the objections of defendant, as to his intentions when he executed the

deed and transfers of property to defendant. We think the testimony was competent and material. The intentions and motives of Bright were the material matters being investigated. In such cases the universal rule is to receive the witness' testimony as to his intentions.''

This evidence was sufficient to support the finding of the trial court that these documents were executed for the purpose of facilitating the settlement of the uncle's estate and not as executed gifts in favor of appellant. It is true that this evidence is not undisputed but the trial court resolved the conflict therein in favor of the respondent. In addition to the above statement of appellant, his acts and conduct immediately subsequent to his uncle's death tended to show that his understanding of his uncle's intention in the execution of those documents was simply to facilitate the settlement of said estate. In our opinion the judgment of the trial court should be affirmed.

Rehearing denied. Houser, J., voted for a rehearing.