**BANK OF AMERICA NAT. TRUST & SAVINGS ASS'N v. ROGAN, Collector of Internal Revenue.**
**No 580–Y.**

District Court, S. D. California, Central Division.
May 18, 1940.

Nicholas & Davis and Wm. Howard Nicholas, all of Los Angeles, Cal., for plaintiff.

Ben Harrison, U. S. Atty., E. H. Mitchell, Asst. U. S. Atty., Armond Monroe Jewell, Asst. U. S. Atty., and Eugene Harpole, Sp. Atty., Bureau of Internal Revenue, all of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

On January 26, 1925, Parker M. Lewis, then aged sixty-four and Elizabeth M. Lewis, then aged thirty-five, were married. Barbara Lewis was born to them on October 2, 1928. They continued to reside in California until the time of Lewis' death on June 10, 1935

As was expected of a man of his age, who possessed an ample fortune, and had married a woman much younger than himself, he took his marriage vows seriously. As soon as questions of money arose, in the true spirit of the marriage service ("with all my wordly goods I thee endow"), he assured his wife that it was not necessary to give her any allowance, that a joint bank account would be opened. This was done and she was given *the right to draw on it at all times.* Lewis owned certain securities, most of which were transferable without registration.

On June 29, 1928, he changed his personal safe deposit box to a joint tenancy box. The agreement, signed by him and his wife, contained the following provisions, among others:

"We, the undersigned, joint renters of the above numbered Safe Deposit Box from the First National Bank of Beverly Hills, Cal. (hereinafter called Bank) hereby declare and represent that we own as joint tenants, with the right of survivorship, all the property of every kind or character now within said box and that all property which may be deposited therein by either or any of us shall be and is, owned by us as joint tenants.

"We, jointly and severally, authorize the Bank to grant access to said Box, to either or any of us and we hereby expressly agree that the Bank is authorized to permit the surrender of the box and/or the removal of the entire contents thereof, by either or any of us without notice to the others or to the survivor of us. * * *

"The undersigned in consideration of the letting of the above numbered safe deposit box by the Bank, acknowledge receipt of two keys thereto and certify that they have received, read and approved a copy of the Bank's rules governing Safe Deposit Boxes printed on the reverse hereof".

Interest coupons were clipped from the securities and deposited in the joint account up to the time of his death.

The couple always visited the safe deposit vault together for that purpose. Early in 1932, they began to discuss the creation of a trust. They were introduced to the trust officer of a bank, who asked them if the trust was to be created out of the separate property of the husband or out of community property. As the conversation which follows was the origin of the agreement entered into on February 15, 1932, we give it as it appears from the testimony given by the trust officer at the trial of this cause. The widow's testimony was to the same effect. But we prefer to give it in the form of the narration of the disinterested party, whose legal training and position are such as to give to his recollection a vividness which the recollection of a lay person would not possess.

"A. Well, Mr. Rymarcsic brought in Mr. and Mrs. Lewis to me and explained to me that they were interested in creating a trust. And I had some discussion with them regarding the preparation of a trust agreement to be submitted to them.

"Q. Did Mr. Lewis at that time tell you the character of their property that he had or that Mrs. Lewis had? Or was there any conversation regarding their property? A. Well, in the drafting of a trust agreement, it is necessary to us to know the ownership of the property, and so we always ask, '*What is the character of the property?*' *Mr. Lewis informed me that it was community property.*

"Q. Was anything else said about the property at that time? A. I asked Mr. Lewis if he had any indication or evidence of this fact, and he informed me that he did not, but I suggested to him that he have his attorney reduce their understanding to writing in order that our records might be clear in connection with the execution of this trust.

"Q. Now, Mr. Quirollo, were the securities which were in this safety deposit box at the old First National Bank and which were delivered to the First National Bank as trustee, were those securities negotiable or non-negotiable or were part of them negotiable and part of them nonnegotiable? A. Some of them were negotiable; some of them were—well, they were all negotiable securities, if we are going to use that word, but some of them were registered and some of them were not."

An attorney was consulted and an agreement was entered into reciting, in effect, that certain property, negotiable instruments, 'attached to the agreement' was to be henceforth community property.

On February 18, 1932, a declaration of trust was executed between the Lewises as trustors and the First National Bank of Beverly Hills as trustee. Into this trust the securities were put.

This trust, created jointly with joint property, could be changed, amended or revoked by their joint action only.

Its detailed conditions need not detain us, because the fundamental issues involved here can be decided without reference to them.

Parker M. Lewis died testate, as a resident of Los Angeles County, California. The plaintiff, the Bank of America National Trust and Savings Bank, was appointed executor of his estate by the Superior Court of the State of California in and for the County of Los Angeles, on July 11, 1935. On October 20, 1938, the court made its order settling the account of the executor and ordering a distribution under the will of the deceased. By the terms of the decree of distribution, the Bank of America was made residuary legatee. This carried with it the right to *"any and all refunds and reimbursements accruing* to said estate, in trust, to be added to and become a part of that certain trust designated Bank of America No. 7, heretofore created by said decedent during his lifetime with the First National Bank of Beverly Hills, of which trust Bank of America National Trust and Savings Association is now Trustee."

On June 4, 1936, the plaintiff filed with the defendant as Collector of Internal Revenue for the Sixth District of California, a federal estate tax return for the estate of Parker M. Lewis, deceased. In it he returned but one-half of the community property owned by the decedent and Elizabeth M. Lewis, to-wit, $91,759.89 principal and $1,124.93 earned dividends and interest, on which he paid the tax. The Commissioner of Internal Revenue, after the audit of the return, declared the agreement of February 15, 1932, void, and issued a deficiency assessment, in the sum of $9,881.48, with interest from June 10, 1936, to February 7, 1937, in the sum of $391.33. The plaintiff paid it. A seasonable claim for refund was made and rejected. In the stipulation of facts, it is agreed that if the plaintiff prevails, the amount which it is entitled to recover is

the sum of $9,282.55, together with interest thereon at the rate of six per cent per annum from May 25, 1937.

The question involved is whether Elizabeth Lewis had, at the time of the death of her husband, an undivided one-half interest in the property,—so as to exempt the value of it from his gross estate under Sections 301–303 of the Revenue Act of 1926.

The applicable portions of these sections are:

"Sec. 300. When used in this title— * * *

"(b) The term 'net estate' means the net estate as determined under the provisions of section 303. * * *

"Sec. 301. (a) In lieu of the tax imposed by Title III of the Revenue Act of 1924, a tax equal to the sum of the following percentages of the value of the net estate (determined as provided in section 303) is hereby imposed upon the transfer of the net estate of every decedent dying after the enactment of this act, whether a resident or nonresident of the United States. * * *

"Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

"(a) To the extent of the interest therein of the decedent at the time of his death;

"(b) To the extent of any interest therein of the surviving spouse, existing at the time of the decedent's death as dower, curtesy, or by virtue of a statute creating an estate in lieu of dower or curtesy;

"(c) To the extent of any interest therein which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * *

"(d) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation

of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * * *

"(e) To the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth. * * *

"Sec. 303. For the purpose of the tax the value of the net estate shall be determined—

"(a) In the case of a resident, by deducting from the value of the gross estate—* * *." 26 U.S.C.A.Int.Rev.Acts, page 224 et seq.

Taxability is urged, especially, under subdivisions (c), (d), and (e) of Section 302.

There is much theoretical and speculative argumentation in the briefs on file. And if we were to follow along the same path, we might turn a situation which is simple in its undisputed factual basis into complicated theorizing. This is entirely unnecessary.

The facts upon which the plaintiff's claim to the refund rests are simple and undisputed.

The rights of the wife are to be determined by the law of California. Talcott v. United States, 9 Cir., 1928, 23 F.2d 897; Gillis v. Welch, 9 Cir., 1935, 80 F.2d 165. If, by this law, at the time of the creation of the trust agreement and, consequently, at the time of Lewis' death, his wife had acquired a "present, existing and equal interest" California Civil Code, Sec. 161a, then the deficiency was exacted wrongly.

If, on the other hand, the wife did not have, at the time, a half interest in the securities which were taken by her and her husband out of the safe deposit box, *held under joint ownership*, and turned over to the trustee, then the Commissioner was right in denying the claim for refund.

I am of the view that the dealings between Parker M. Lewis and Elizabeth M.

Lewis, from the time of their marriage on January 26, 1925, to the date of the husband's death, on June 10, 1935, show a clear intent on the part of the husband to transmute certain separate property into joint property.

■ This is evidenced not only by the uncontradicted conversations related by the widow at the time of the trial, but also by the joint bank account, established shortly after their marriage, and into which the income from the securities was deposited, and the joint safe deposit box in which the securities were held, opened under a contract which specifically declared the two persons having access to it to be the joint owners, with right of survivorship of the property therein contained. The contents of the bank account and of the safe deposit box became joint property. See Wallace v. Riley, 1937, 23 Cal.App.2d 669, 74 P.2d 800; In re Gaines' Estate, Cal.Sup., 1940, 100 P.2d 1055; Young v. Young, 1932, 126 Cal.App. 306, 14 P.2d 580.

■ The agreement of February 15, 1932, cannot be disregarded. It reduced to definite form what had been the oral understanding between the parties which was also exemplified by the joint ownership of the bank account and the safe deposit box. The way the agreement came into being speaks of the good faith of the parties.

When the trust officer with whom they discussed the creation of a trust estate asked the question whether it was to be created out of separate or community property, he was informed that the *property was community property*.

When informed that no formal document existed creating this status as to this property, he suggested that the gap be supplied. And the agreement was the result. With commendable brevity it sets forth the desire to give to the property listed in the schedule attached to it the status of community property,—"In the same manner and to the same effect as if acquired by the parties hereto during coverture from the joint earnings of these parties, as contemplated in Section 687 of the Civil Code of California".

These words are as effective in creating the transmutation as were those in the instruments under consideration in United States v. Goodyear, 9 Cir., 1938, 99 F.2d 523 and in Bigelow v. Commissioner, 1939, 39 B.T.A. 635. And see Young v. Young, 1932, 126 Cal.App. 306, 311, 14 P.2d 580; California Civil Code, Secs. 158, 159. The mutual consent of the parties is, by the very wording of the California Civil Code (California Civil Code, Sec. 160), made a sufficient consideration for any contracts between husband and wife seeking to change their legal rights as to property. California Civil Code, Sec. 159; and see In re Freitas, D.C.Cal., 1936, 16 F.Supp. 557, 559; Kenney v. Kenney, 1934, 220 Cal. 134, 30 P.2d 398; Siberell v. Siberell, 1932, 214 Cal. 767, 772, 7 P.2d 1003.

Section 161a of the California Civil Code, enacted in 1927, evidences the intent on the part of the Legislature to declare definitely the nature of the interest of spouses in the community property to be, during the continuance of the marriage relation, "present, existing and equal". The aim was to overcome certain older decisions of California courts, such as Stewart v. Stewart, 1926, 199 Cal. 318, 249 P. 197, and other cases, in which the courts, in defining the nature of the wife's interest during the continuance of the marriage relation, had declined to give to it the status of *a vested interest*.

Stewart v. Stewart, supra, thus summed up the character of the wife's interest: "We wish to say in conclusion that we are in accord with the intimations from time to time reflected by this court in the long line of its past decisions to the effect that the interest of the wife in the property of the community during the continuance of the marriage relation, *while it has not yet reached the status of a vested interest therein, is, and has always been from a time reaching back into the Spanish and Mexican originals of our community property laws, a much more definite and present interest than is that of an ordinary heir*. She has, by virtue of the share which in her own sphere she has contributed toward the acquisition and conservation of such properties, rights therein which have been always safeguarded against the fraudulent or inconsiderate acts of her husband with relation thereto, and for the assertion and safeguarding of which she has been given access to appropriate judicial remedies both before and after the time when her said rights and interests would ripen and become vested through the death of the husband or other severance of the marriage relation, whenever such rights and ultimate in-

terests were affected by or threatened with such forms of invasion." Stewart v. Stewart, 1926, 199 Cal. 318, 342, 249 P. 197, 207. (Italics added.)

Historical consideration of the law of community property as expressed in the Spanish law of gananciales leads to the conclusion that the right of the wife, even before the enactment of Section 161a, was a more definite and present interest than that of a mere heir. Now, courts concede to her right to recover it when conveyed fraudulently. See Britton v. Hammell, 1935, 4 Cal.2d 690, 52 P.2d 221; Ballinger v. Ballinger, 1937, 9 Cal.2d 330, 70 P.2d 629; Trimble v. Trimble, 1933, 219 Cal. 340, 26 P.2d 477.

Arguments by analogy may help, at times.

But, where the nature of an estate is determined by the law of the State, arguments by analogy from gift cases and other tax cases are of little help.

■ Ultimately, the nature of the interest of the wife in community property must be determined, not by reference to the federal tax statutes, but in the light of the property law of California. The management and control, which the husband has under the law of California, does not defeat the character of the wife's interest as that of a half owner. California Civil Code, Secs. 172, 172a. When property is given its community character by agreement, it acquires such characteristic the moment the agreement between the spouses is made.

■ So here, the agreement of February 15, 1932, merely carried into effect previous understanding, which had existed for many years as to common ownership of the property. By changing the ownership from joint tenancy to community, the amount of Mrs. Lewis' interest was not changed. It remained one-half. Certain incidences characteristic of joint tenancy were surrendered by her. In reality, the character of her estate was debased. She received, in exchange, a half interest which carried certain detriments not attendant upon a joint tenancy interest. But her ownership of one-half, of which she could not be deprived without

her consent, remained as absolute as before. Whatever we may call it, it is certainly an interest belonging to the wife, which should not be included in the husband's estate. See Sampson v. Welch, D. C.Cal., 1938, 23 F.Supp. 271, per Jenney, J.; Estate of Simon, 1939, 40 B.T.A. 650; and see Burnet v. Wells, 1933, 289 U.S. 670, 678, 679, 53 S.Ct. 761, 77 L.Ed. 1439; United States v. Malcolm, 1931, 282 U.S. 792, 51 S.Ct. 184, 75 L.Ed. 714; see, also, M. R. Kirkwood, The Ownership of Community Property in California, 1933, 7 So. Calif.Law Review, 1.

The decision of the Supreme Court in United States v. Malcolm, 1931, 282 U.S. 792, 51 S.Ct. 184, 75 L.Ed. 714, is very illuminating on this point. The court, in United States v. Robbins, 1926, 269 U.S. 315, 46 S.Ct. 148, 149, 70 L.Ed. 285, had denied to wives in California the right to return half of the earnings of the community property, because "the wife had a mere expectancy while living with her husband".

After the enactment of Section 161a of the Civil Code, the court changed its attitude. What caused the change? The opinion in United States v. Malcolm, supra, answers the question certified to it by referring to three of its own decisions decided at the same term,—Poe v. Seaborn, 1930, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239, involving the community property law of Washington, Goodell v. Koch, 1930, 282 U.S. 118, 51 S.Ct. 62, 75 L.Ed. 247, which arose under the Arizona community property law, and Hopkins v. Bacon, 1930, 282 U.S. 122, 51 S.Ct. 62, 75 L.Ed. 249, arising under the Texas statute.

These three decisions hold that *each of the particular statutes confers upon the wife a present vested interest equal with that of her husband.*

Manifestly, then, the court thought that the change made in 1927 gave to California wives a similar interest. And see Bender v. Pfaff, 1930, 282 U.S. 127, 51 S.Ct. 64, 75 L.Ed. 252, arising under the Louisiana law.[1]

If, despite the husband's power of management and control over the community property, California Civil Code, Secs. 172,

---

[1] In Gillis v. Welch, 9 Cir., 1935, 80 F.2d 165, 167, there is this statement in a footnote by Garrecht, J., as to the effect of the 1927 amendment: "In 1927 an amendment to the Civil Code of California (section 161a) provided that the wife was to have *a vested interest* in the community property equal to that of the husband, although he was still left with the possession and control thereof." (Italics added.)

172a, during his lifetime, the wife may return, *as her own,* one-half of the income from it, I fail to see why, after his death, her share, now wholly released of his management or control, should be considered a part of his estate. Her share, upon the husband's death, "belongs" to her. California Probate Code, Secs. 201, 201.5. How then could it also "belong" to the husband's estate and be a part of it?

If we give to these codifications their plain meaning, in the light of their legislative history, the answer is obvious:

Whether it meet all the abstract or dogmatic tests of a "vested" interest or not,—the interest of the wife involves an ownership of her own, definite enough to warrant its exclusion from the husband's estate.

■ Translated into the terms of the clauses of Section 302 of the Revenue Act of 1926, which it is sought to apply, this conclusion as to the nature of the wife's estate means: The husband has no interest in it. Revenue Act of 1926, § 302 (a). It is not in lieu of dower. Revenue Act of 1926, Sec. 302(b); California Civil Code, Sec. 173; Hernandez v. Becker, 10 Cir., 1931, 54 F.2d 542. It is not a transfer intended to take effect in possession or enjoyment after the husband's death, Revenue Act, 1926, § 302(c), a revocable trust, made in contemplation of death, Revenue Act, 1926, 302(d), or a joint tenancy Revenue Act, 1926, 302(e).

■ It will not do to apply to this transaction the analogy of the "conduit" cases. Here the wife was not used as the vehicle to achieve a result,—such as the formation of the trust.

The agreement aimed to ratify a condition which existed before, which had been created by the actions of the spouses, without the intervention of any legal technicians.

The legal technician suggested a method of evidencing their intention. And as no particular form of agreement is necessary to change the character of personal property, California Civil Code, Sec. 158; Estate of Harris, 1915, 169 Cal. 725, 147 P. 967; Kennedy v. McMurray, 1915, 169 Cal. 287, 146 P. 647, Ann.Cas.1916D, 515; Estate of Sill, 1932, 121 Cal.App. 202, 204, 9 P.2d 243; Kenney v. Kenney, 1934, 220 Cal. 134, 30 P.2d 398; Young v. Young, 1932, 126 Cal.App. 306, 14 P.2d 580, it would be inequitable to deprive the wife of her right to ownership of half of the property which she had enjoyed for many years prior to 1932, because she and her husband followed the advice of a trust officer and reduced the agreement between them to more formal writing.

The good faith of the parties is apparent. And the fact that the agreement was followed, on February 18, 1932, by a declaration of trust does not destroy its effectiveness. Into the trust went their joint property. The trust was revocable by their joint action only. Unless there were evidence to show that the transmutation agreement of February 15, 1932, was a subterfuge used for the purpose of avoiding taxation, its duration is of no moment. It would be effective for the purpose, no matter what its duration. Its execution impressed the property with the character of community property and, thereafter, when the two spouses jointly handed it over to the trustee, *they did so as co-owners,* the character of whose interest was the result of an agreement of long duration, which was merely put into formal legal form at a definite date.

The controversy in this case is referable to the simple proposition we have stated at the outset,—whether the wife has such an interest as must be excluded from the computation of the tax on the estate of the husband under the Revenue Act of 1926.

In what precedes, we have given, in brief outline, the grounds for reaching the conclusion that the interest of the wife was of this character.

This makes it unnecessary to deal with some of the other theoretical and abstract considerations and arguments as to the nature of community property ownership to be found in the writings of taxation experts and some court decisions. By dissecting our community property law and subjecting it to various categorical tests, one could easily pulverize and reduce to naught the interest of the wife, so as to deprive California wives, for taxation purposes, of the benefits which communal ownership confers upon them. We prefer to deal with realities.

Judgment will therefore be for the plaintiff for the sum of $9,282.55, together with interest thereon at the rate of six per cent per annum from March 25, 1937.

Findings and judgment to be prepared by counsel for the plaintiff under Local Rule 8.