[Civ. No. 23467.   Second Dist., Div. Three.   Sept. 21, 1959.]

N. E. YOUNGBLOOD et al., Respondents, v. VICTOR SILVAGNI, Appellant.

Robert H. Powsner for Appellant.

N. E. Youngblood and Anthony T. Carsola, in pro. per., and Marvin Gross for Respondents.

WOOD (Parker), J.—Plaintiffs' first cause of action is for declaratory relief regarding an agreement for attorneys' fees. The second cause of action is for the reasonable value of services rendered, in the alleged amount of $25,000. The third cause of action is for money lent in the amount of $1,114.68. The fourth is for $500 on an account stated. The fifth is for money lent in the amount of $320.93.

At the pretrial, defendant stipulated to judgment for plaintiffs on the third and fifth causes of action (for money lent). The trial proceeded upon the causes of action for declaratory relief, reasonable value of services, and account stated.

Judgment for plaintiffs included the amounts alleged in the third, fourth, and fifth causes of action (for money lent and account stated). Defendant (appellant) makes no contention on appeal regarding the judgment on those causes

of action. The judgment also declares that the written agreement is valid and that defendant's (appellant's) discharge of plaintiffs was without legal cause. The judgment awarded the plaintiffs 3,750 shares of stock of the Silvagni Estate Company, and ordered defendant to execute the necessary documents to effect an assignment of the shares, and awarded plaintiffs a lien upon the interest of defendant in said company. Defendant appeals from the judgment.

Defendant Victor Silvagni and his brother Michael had had a controversy with their father as to their alleged interests in the Silvagni Estate Company, a corporation, which owned property in Las Vegas, Nevada. The sons claimed that the father had improperly deprived them of income from the company. About November, 1954, defendant (Victor) consulted plaintiff Carsola, attorney at law, whom he had known in college in 1939. Mr. Carsola went to Las Vegas and discussed the controversy with the father; and he conferred with defendant about the matter at various times in January, February, and the first half of March, 1955. In one of those conferences defendant said that Mr. Carsola should have a more experienced attorney associated with him in the matter. Mr. Carsola mentioned the name of Mr. Youngblood.

On March 17, 1955, Mr. Carsola introduced Mr. Youngblood to defendant and Michael, and the four of them had a conference regarding the controversy, the matter of being represented by the attorneys, and the matter of providing money for the brothers.

On March 18 the attorneys and the brothers had another conference wherein the controversy and the financial problems of the brothers were discussed. Mr. Carsola testified that at the conference he said that each brother owed him $500 for past legal services, and that Mr. Youngblood would be the chief counsel if defendant retained him. At that conference Mr. Youngblood lent $650 to Michael, and on March 22 he lent $500 to defendant. Between March 18 and April 24, Mr. Youngblood and defendant had several conferences in connection with the preliminary investigation as to the facts of the controversy. Mr. Youngblood testified that he said, at one of those conferences, that until a written fee agreement was signed by the defendant he would not represent defendant.

On April 24 the attorneys and the brothers had a conference at defendant's home regarding a proposed written agreement which the attorneys had prepared. In the proposed

agreement, as submitted to defendant by the attorneys, there was a blank space wherein the amount of the fee, stated in percentage of recovery, was to be inserted. During the conference, which continued about 45 minutes, the blank space (as to percentage) was filled in with the word "fifteen," and then the agreement was signed by the attorneys and defendant. The agreement provided that the attorneys would represent defendant in establishing his interest in the corporation; the fee of the attorneys would be "a sum equivalent to fifteen percent of the 'gross recovery.' " which would include "the value of any interest established to be owned" by defendant; the percentage would apply "either by settlement or otherwise"; the attorneys would have a lien against a "settlement" or judgment; and the defendant would advance all costs. The agreement is set out in the margin.[1]   Also, during that

---

[1]"April 24, 1955

"Mr. Victor Silvagni,
    2936 North Marengo Avenue,
    Altadena, California.

Re: Silvagni vs. Silvagni

"Dear Mr. Silvagni:

"In accordance with our verbal agreement it is our understanding and it is our agreement that we shall represent you in doing whatever is reasonably necessary to establish your interest through ownership of stock or otherwise in your family corporation, the details of which have been discussed with you and with which you are thoroughly familiar.

"In the event legal action becomes necessary, it will be prosecuted through the proper court in such manner as we agree to be expedient. You shall have sole determination of any offer of settlement, but we will, of course, give to you our recommendations.

VAS    "Our fee in this connection will be a sum equivalent to fifteen percent of the 'gross recovery' in your behalf, which shall include the value of any interest established to be owned by you in this proceeding. This percentage shall apply either by settlement or otherwise, and it is understood and agreed that we shall have a lien against said cause of action, settlement, judgment, amount to be paid or to become due, and that you will advance and pay any and all court costs and other expenses as they become necessary from time to time.

"In the event the foregoing corresponds with your understanding of our agreement please sign the original of this letter in the space provided below, return to us for our files, and we shall proceed accordingly.

Very truly yours,
    N. E. YOUNGBLOOD
For N. E. Youngblood and
Anthony T. Carsola

Accepted and approved:
    VICTOR A. SILVAGNI
Victor Silvagni"

conference the attorneys and Michael entered into a similar agreement.

Defendant testified that, at the conference on April 24 and on several previous occasions, he said that his income from Las Vegas (his salary of $1,000 a month from the corporation) would be cut off if he undertook a stock recovery venture or a lawsuit; that he also said that, as he had stated previously, he would need money in order to live, and that it was understood that the attorneys were going to arrange to lend him $10,000 in order for ''us to live and get by'' during the litigation; that Mr. Youngblood replied that the money would be available and forthcoming in about four weeks; that Mr. Carsola replied, ''Don't worry. You will get the money.'' Mr. Carsola testified that, at the conference on April 24, defendant said that his financial matters were pressing and that before they ''go into this sitting down and signing any contract'' he wanted to know how the money situation was coming and to know what is going to be done financially in connection with the matter. Mr. Carsola testified that Mr. Youngblood replied, ''Well, I can't promise anything. I will do what I can.'' Mr. Carsola also testified that he (witness) replied that the State Bar takes a dim view of the matter of attorneys advancing substantial sums of money to clients, but it is all right for emergency purposes; that he (witness) would do all he could to get available money; that he thought he knew persons who would lend money to defendant, based upon the stock ownership expectancy, but the money would come from other persons and he would guarantee the loans. Mr. Youngblood testified that on April 24, after the agreement had been signed, he said in substance that they (attorneys) would still try to assist them in obtaining a loan with which to alleviate their temporary financial distress, but that was not a part of the attorneys' representation of them in this matter.

On the day after the agreement was signed, Mr. Youngblood lent $1,000 to Michael and $100 to defendant. Two days thereafter he lent $200 to defendant. About two weeks thereafter he lent $250 to Michael and $150 to defendant.

Mr. Youngblood testified that, immediately preceding the signing of the agreement, he said, ''You recognize, boys, that if you recover your stock, we will probably have to take our fifteen percent of the recovery in kind or by taking it in stock. . . . Otherwise there would be only one way in which it could be determined, and that would be if we were to discuss and agree that the stock you recovered had a specific value,

by mutual agreement determine the value, and then we would agree, or should we so determine, we might possibly agree on taking fifteen percent of that agreed evaluation.''

On April 29 the attorneys wrote a letter to each of the following persons (who owned interests in the corporation) : the father, and the two sisters of defendant. The letter stated that the attorneys had been retained by defendant and Michael to take action against the addressees to establish and recover the interests of defendant and Michael in the family corporation known as Silvagni Estate Company; that the attorneys did not desire to cause the addressees any more inconvenience and expense than the addressees made necessary, but the attorneys insisted that their clients' interests be preserved; that the attorneys would be happy to confer with the addressees or their attorneys to ascertain whether the controversy could be worked out upon an amicable basis.

On May 2 the attorneys conferred with defendant and Michael approximately two and a half hours. On May 11 the attorneys examined corporation papers in Carson City, Nevada. The attorneys prepared a rough draft of a complaint on behalf of the brothers against the corporation, and its officers and stockholders. Mr. Youngblood testified that he did not maintain a record of the number of hours he performed legal services for the defendant, but he estimated that the number of hours was in excess of 125. He also testified that he, Mr. Carsola, and Mr. Gross (an attorney associated with Mr. Youngblood) did ''some research'' in connection with the matter.

On May 23 defendant sent a notice to the attorneys wherein he stated that he terminated the relationship of attorney and client and the authority of the attorneys to represent him; he desired to pay the attorneys a reasonable fee for their services to that date; and if the attorneys would send a bill to him he would make arrangements to pay it if it was reasonable.

On May 31 defendant called Mr. Carsola by telephone and said that he was willing to attempt to pursue the litigation ''if their verbal part of the contract of promising the $10,000 would be lived up to.'' Pursuant to that conversation, Mr. Youngblood telephoned defendant who was in Las Vegas. Defendant testified that in that conversation he said he was interested in proceeding with the litigation ''if the verbal part of the contract involving the $10,000 could be lived up to.'' Mr. Youngblood testified that in that conversation he said he

would not do anything further in defendant's behalf unless defendant sent him a notice repudiating the termination of the attorneys' authority and authorizing the attorneys to proceed as originally authorized. Defendant did not send such a notice.

Mr. Youngblood testified that, at a conference on June 29, when the attorneys and the brothers were present, he (witness) said that the attorneys were willing to proceed with the action if the brothers would repudiate the attempted revocation of the attorneys' authority; defendant replied that he would not repudiate the notice unless he (witness) lent them $10,000. Mr. Youngblood testified further that he said he had not agreed to make that loan; he had attempted to work out loans for them with other persons; he understood that the brothers had rejected the loans; he did not deem that the attorneys had any obligation under the fee agreement to lend money; and he did not intend to lend money.

In June 1955, a controversy arose between defendant's father and other directors of the corporation (two daughters and one Wartman) regarding an account which the father had opened in the Bank of Nevada. On June 17 the bank commenced an action in interpleader to determine the rights of the parties to the bank account. On July 5 the defendant, Michael, the two sisters, and the father entered into a compromise agreement in that action, which agreement provided that 25,000 shares of stock (of the 200,000 shares) of the corporation would be issued to each of the brothers and sisters; the stock would be delivered to the First National Bank of Nevada, as bailee, to be held as a bailment until 10 years after the death of defendant's father; dividends on the stock, issued to the brothers and sisters, would be paid to them; salaries would be paid to the brothers and sisters in the same amounts as had been paid to them during the year 1955; during the term of the bailment, none of the parties had the right to transfer or encumber the stock or dividends or salaries; the stock, dividends, and salaries would not be subject to the claims of creditors; at the termination of the bailment, if any party to the bailment desired to sell his stock, he must sell said stock to the corporation. The agreement provided further than the 100,000 shares of stock to be issued to the brothers and sisters (25,000 shares each) consisted of stock which theretofore had been held: (1) in the names of the sisters as their own stock; and (2) in the name

of one of the sisters as trustee for the other sister, Michael, and the defendant.

Defendant testified that, after he signed the compromise agreement, 25,000 shares of the stock were issued to him; he did not receive possession of the stock; he, Michael, the husband of Lena (one of the sisters), and defendant's other sister (Olga) placed the stock "in care of the First National Bank of Nevada, in bailment."

On August 8, 1955, the attorneys sent a letter to defendant and his wife stating that demand was made for payment of money advanced by the attorneys, and for payment of money expended by the attorneys in connection with their representation of defendant. The letter also stated that demand was made "for payment of our legal fees in the same connection."

The court found, among other things, as follows: On April 24, 1955, defendant employed plaintiffs under a written fee contract (the letter of April 24 quoted hereinabove). The contract is a valid and existing fee contract between the plaintiffs and defendant, and it is fair and just, and no undue influence or duress was exercised by either plaintiff upon defendant. Defendant entered into the contract voluntarily and understood the meaning of the contract, and no advantage was taken of defendant by either plaintiff. The contract was not entered into by reason of any promise by either plaintiff to obtain loans or money for defendant. There was a sufficient and valid consideration for the contract, and the plaintiffs were prevented from performing the contract by conduct of the defendant. The action taken by plaintiffs in defendant's behalf, after the agreement was executed, was a proximate cause of the compromise settlement. No relationship of attorney and client existed between Mr. Youngblood and defendant until the execution of the contract on April 24 as to any matters covered by the contract. A relation of attorney and client existed between Mr. Carsola and defendant from November 1, 1954, to March 18, 1955, and that relation ceased to exist as of said March 18 by mutual agreement. Mr. Carsola rendered no services as an attorney at law on behalf of defendant from said March 18 to said April 24, and no relation of attorney and client existed between them during that period. Immediately following April 24 plaintiffs commenced representation of defendant, and they have performed all of the terms and conditions of the contract on their part to be performed, except as prevented by defendant. On May 26, 1955, plaintiffs received from defendant "Notice

Terminating Authority of Attorney," dated May 23, 1955. The purported discharge of plaintiffs by defendant was without legal or any cause. At the time of said purported discharge plaintiffs were ready, willing and able to perform all the terms and conditions of the agreement on their part to be performed. About May 31, 1955, defendant attempted to make an oral revocation of his prior instructions terminating authority of attorneys, and orally promised to furnish to plaintiffs a written acknowledgment of the oral revocation, and requested that plaintiffs proceed forthwith to represent defendant as originally authorized by the written agreement of April 24, but defendant failed to furnish such acknowledgment of the revocation and on June 29, 1955, defendant refused to sign such a written acknowledgment which was submitted by plaintiffs to defendants. After June 29 neither plaintiff did anything on behalf of defendant. About July 5, 1955, defendant entered into a settlement agreement relating to his interest in the Silvagni Estate Company. The settlement agreement was entered into by defendant as a part of a fraudulent plan to defeat any interest of plaintiffs in the stock of that company, by lien or otherwise, through the purported irrevocable bailment set up in the settlement agreement. The bailment is voidable insofar as plaintiffs are concerned to the extent of their interest in the stock, and the extent of the lien imposed upon the stock under the terms of the fee agreement of April 24. The settlement agreement was entered into by the defendant without the consent of either plaintiff and was negotiated for the sole purpose of defrauding plaintiffs. By reason of the fact that the court has determined that the fee agreement is a valid contract under which the plaintiffs are entitled to recover as prayed, there is no necessity for a determination in connection with the second cause of action (for reasonable value of services). During the period from March 17 to May 10, 1955, Mr. Youngblood lent $1,114.68 to defendant and no part thereof has been repaid. About said March 18 there was an account stated between Mr. Carsola and defendant whereby $500 was due to Mr. Carsola, and no part thereof had been paid. During the period from November 15, 1954, to May 10, 1955, Mr. Carsola lent $320.93 to defendant and no part thereof has been repaid. Prior to and as a part of the execution of the fee agreement plaintiffs and defendant agreed that in the event of a recovery of defendant's claimed interest in the corporation, in capital stock, 15 per cent thereof would be payable to plaintiffs in kind, unless by mutual agree-

ment the parties agreed upon the value of the stock, in which event plaintiffs could elect whether the fee would be payable in kind or in money equivalent. No mutual agreement was reached as to the value of the stock. Neither of the plaintiffs lent or agreed to lend money to defendant as a part of the written agreement by which plaintiffs were employed to represent defendant. Under the terms of the fee agreement plaintiffs were granted a lien upon the claimed interest of defendant in the corporation, by stock or otherwise, to the extent of 15 per cent of the gross recovery, and further to secure reimbursement for all money advanced by either plaintiff to defendant.

The judgment included provisions which were the same as the findings with respect to: (1) the fee contract being valid, fair, and voluntarily made for a valid consideration; (2) the plaintiffs being prevented from performing the contract by conduct of defendant; (3) there being no relationship of attorney and client at the time the contract was made. The judgment also provided that plaintiffs recover from defendant, and the plaintiffs are awarded, 3,750 shares of the capital stock in the Silvagni Estate Company, constituting 15 per cent of 25,000 shares derived by defendant under the settlement of July 5, 1955, which shares are of record in the name of defendant or deposited in the First National Bank, Las Vegas, Nevada, for his account, and the defendant is ordered to execute forthwith the necessary documents to effect an assignment of the 3,750 shares to plaintiffs, and pending the execution of the documents the defendant is enjoined from transferring or encumbering the shares. Plaintiffs are awarded a lien upon all claimed interest of defendant in the corporation derived by him under the settlement agreement, by stock or otherwise, including the stock of record in his name or deposited in said bank in Nevada for his account to the extent of 15 per cent of the gross recovery by defendant, and further to secure reimbursement for all money advanced by either plaintiff to defendant including all money to which plaintiffs are entitled under the judgment.

One of the contentions of appellant is to the effect that the court erred in awarding stock in the family corporation to the plaintiffs, for the reason the agreement did not provide for compensation in that form but did provide for money compensation of 15 per cent of the value of the stock allegedly recovered. Appellant refers particularly to the portion of the agreement which is as follows: ''Our fee in this

connection will be a sum equivalent to fifteen percent of the 'gross recovery' in your behalf, which shall include the value of any interest established to be owned by you in this proceeding.'' He argues that the words ''sum equivalent to fifteen percent'' and ''value of any interest'' mean money and do not mean shares of stock; that the written agreement was not ambiguous, and the testimony of Mr. Youngblood to the effect that the fee was to be ''in kind'' should be disregarded. In one place in plaintiffs' (respondents') brief (p. 13), they assert that ''there is some ambiguity'' in the agreement. At another place in their brief (p. 23), they assert that ''the fee agreement is clear and unequivocal.'' They assert also to the effect that it was proper to consider the testimony of Mr. Youngblood to the effect that the fee was to be ''in kind,'' that is, shares of stock. It is to be noted that the first paragraph of the agreement, prepared by the attorneys, recites that the attorneys understand that their agreement is to represent defendant in establishing his interest in the family corporation ''through ownership of stock'' or otherwise. After having shown clearly in the agreement that the main purpose of the representation was to establish defendant's ownership of stock in the family corporation, the attorneys then recite in their agreement that ''Our *fee in this connection* will be a *sum* equivalent to fifteen percent of the 'gross recovery' in your behalf, which shall include the *value* of any interest established . . . .'' (Italics added.) It is apparent that the words ''in this connection'' refer to the attorneys' representation of defendant in establishing his ownership of stock. It is also apparent that the words ''sum'' and ''value,'' used in stating what the fee would be ''in this connection,'' were not used as substitutes for, or synonyms of, the word ''stock.'' In their brief, the plaintiffs (attorneys) refer to the agreement as the ''fee agreement.'' It is obvious that the main point of the attorneys in preparing the ''fee agreement'' and submitting it to defendant for his signature was to have a written agreement which stated what the fee would be. It seems to be the position of plaintiffs that they, as attorneys at law, in preparing their ''fee agreement,'' overlooked the main point which they intended to cover by the agreement, with the result that they prepared an ambiguous agreement and therefore they were entitled to resort to parol evidence to explain that the words ''sum'' and ''value,'' used by them, did not refer to money but did refer to and mean

shares of stock. In *Bennett* v. *Potter,* 180 Cal. 736 [183 P. 156], wherein plaintiffs sought to recover fees for legal services, it was said at page 740: ''The contract was drawn by the plaintiff, Bennett. Hence, it is to be interpreted most strongly against the plaintiffs. This rule is accentuated by the fact that the plaintiffs were attorneys at law and presumably familiar with legal terms and proceedings and accustomed to the use of language appropriate to the framing of contracts . . . .'' In the present case, as above shown, there was testimony by Mr. Youngblood to the effect that he told defendant and Michael that probably the attorneys would have to take their 15 per cent in kind, otherwise the only way would be to mutually agree as to the value of the stock and then the attorneys might agree on taking 15 per cent of the valuation. Defendant testified that there may have been some conversation with reference to determining the 15 per cent by agreeing as to the value of the stock but he did not remember what the conversation was. Michael testified that he did not think they (he and defendant) agreed to apply the 15 per cent to the stock, because they (brothers) wanted their own stock. The stock of the Silvagni Estate Company was owned by members of the Silvagni family. It is reasonable to assume that the defendant or other members of the family would not want persons other than members of the family to own stock in the company. If it was the intention of the plaintiffs (attorneys), at the time the written agreement was made, to claim shares of stock instead of money as their fee, it would have been a simple matter to so state in the writing. As it now is, the attorneys rely on conversations, allegedly occurring at the time of executing the fee agreement, to explain the agreement. ■ Whether an agreement is ambiguous is a question of law, and the trial court's finding on that issue is not binding on a reviewing court. (*Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 133 [48 P.2d 13].) ■ The words ''sum'' and ''value,'' as used in the written agreement herein, should not be interpreted to mean that the fee would be shares of stock. The written agreement was not ambiguous. The trial court should not have considered the parol evidence in determining whether the agreement meant that the fee would be shares of stock or money. ■ ''The parol evidence rule, as is now universally recognized, is not a rule of evidence but is one of substantive law. . . . ■ The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an

agreement in a writing (the 'integration'), *becomes the contract of the parties. . . .* ■ Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. ■ The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations." (*Estate of Gaines,* 15 Cal.2d 255, 264-265 [100 P.2d 1055].) In the present case the defendant did not object to the parol evidence. ■ Parol evidence, "though admitted without objection, must be ignored as of no legal import and its incompetency to vary a written contract is a matter of law." (*Lifton* v. *Harshman,* 80 Cal.App.2d 422, 432 [182 P.2d 222].)

■ Appellant also contends that the court erred in awarding a lien upon the stock to secure reimbursement of money lent or advanced to him. The provision in the written agreement regarding a lien is as follows: "This percentage shall apply either by settlement or otherwise, and it is understood and agreed that we shall have a lien against said cause of action, settlement, judgment, . . . and that you will advance and pay any and all court costs and other expenses as they become necessary from time to time." The contract did not provide for a lien to secure the reimbursement of money lent or advanced to defendant. The court erred in imposing such a lien. (It is not to be understood that this court, by ruling upon the contention as to a lien for money lent, is impliedly or at all deciding that it was proper to impose a lien for any purpose upon the stock which was located in Nevada. This court is not determining that question. ʂᵉᵉ *Hardy* v. *Hardy,* 164 Cal.App.2d 77, 79 [330 P.2d 278].)

Some of the other contentions of appellant are: (1) The court erred in rendering judgment which in effect ordered appellant to specifically perform the agreement by transferring stock to plaintiffs, when there was no proof of performance by plaintiffs, when the agreement lacked mutuality, and when there was no pleading or proof of inadequacy of remedy at law. (2) The court erred in awarding stock, because the spendthrift trust was not a "recovery" under the agreement. (3) The provisions of the judgment imposing liens on stock in Nevada are void. (4) The court erred in

finding that the relationship of attorney and client did not exist at the time the agreement was made. (5) The appellant did not receive a fair trial.

In view of the above conclusion to the effect that the court erred in considering parol evidence and that such error requires a reversal of a portion of the judgment, it is not necessary to determine other contention on appeal.

As above stated, the appellant does not contend on appeal that the judgment is erroneous as to the portions thereof which are based on the third, fourth, and fifth causes of action (which causes of action pertain to money lent and account stated.) The portions of the judgment (paragraph V and VI) pertaining to those causes of action should be affirmed. The other portions of the judgment should be reversed.

The portion of the judgment, designated paragraph V, awarding $1,114.68 and interest, and the portion of the judgment, designated paragraph VI, awarding $820.93 and interest, are affirmed. The other portions of the judgment are reversed.

Shinn, P. J., and Vallée, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied November 18, 1959. Peters, J., was of the opinion that the petition should be granted.