[Civ. No. 13672.   First Dist., Div. One.   Oct. 19, 1948.]

R. DUFF WILLSON, Respondent, v. NIAGARA
DUPLICATOR CO. (a Corporation), Appellant.

Bronson, Bronson & McKinnon for Appellant.

Aaron M. Sargent for Respondent.

PETERS, P. J.—Plaintiff brought this action to recover certain commissions allegedly earned by him while employed by defendant under a written contract as sales manager and director of public relations. The main question presented is whether the written contract provided for commissions on all contracts secured by the company while plaintiff was employed, or provided for commissions on transactions only where the customer was billed during the term of the employment. Involved in the determination of this question is the problem as to whether parol evidence was properly admitted to explain the written document. The trial court determined all basic issues in favor of plaintiff, and granted him judgment in the sum of $4,142.63. Defendant appeals.

The original complaint prayed for commissions under the contract, and alleged, substantially, that defendant's president had deceived plaintiff with respect to the meaning and effect of the contract. The amended complaint made the same essential allegations, and, in addition, set up a cause of action for declaratory relief to have the meaning of the contract ascertained. At the trial plaintiff abandoned his cause of action for declaratory relief when it appeared that all of the trans-

actions had been completed and were proper subjects of a money judgment. During the trial, over the objections of defendant, the plaintiff was permitted to file a second amended complaint to conform to the proof. That complaint set up the contract, the nature and extent of defendant's business during plaintiff's employment, and repeated, in greater detail, the charges against defendant of misrepresentation and fraud.

The facts most favorable to plaintiff are as follows: L. John Himes was the president and principal stockholder of defendant corporation. All negotiations with plaintiff on behalf of the corporation were carried on by Himes, and it is admitted that he had full authority to act. The business of the company (manufacture of stencils, etc.) was adversely affected by the war. Himes desired to get some subcontracts to manufacture or machine airplane parts. The then existing staff of the corporation was not securing this business, and it was to assist in this regard that plaintiff was employed. Plaintiff is an engineer with over 15 years' experience in the airplane industry. He first met Himes in November, 1942, and at that time Himes told him that he wanted someone who knew the aircraft industry and who had the proper contacts to get the business. In December of 1942, plaintiff was hired as director of public relations of the defendant at a salary of $400 per month. His chief duty was to introduce the defendant's staff to executives in the aircraft industry. Plaintiff worked under this arrangement until March, 1943, and apparently his services were most satisfactory. On March 6, 1943, plaintiff visited Himes at the latter's home in Arizona. At that time ''Himes stated that they were in great need of aircraft business; that Mr. Springer [the then sales representative of defendant in Los Angeles] had not been able to get any orders up to this time; and that if I would take on the job of getting the orders, in addition to just introducing the company to the aircraft industry, he would pay me one per cent of all the business I got as orders, and one-half per cent on all the business that Mr. Springer got with my assistance.'' On March 12, 1943, Himes verified this oral arrangement by a letter to plaintiff, stating that a formal contract would be later prepared ''but you can take this in meantime as fact we agree you are to receive 1% on net sales you turn in as orders.'' Plaintiff worked under this arrangement until April 23, 1943, and again his services must have been most satisfactory. On this date he again conferred with

Himes in Los Angeles. At this conference ''Himes told me that he was reorganizing his company, or making some organizational changes in the company, and that he would like to have me take the responsibility of all sales, and be the sales manager. And I asked Mr. Himes what he had in mind. And Mr. Himes said that he wanted me to be the sales manager, and that he would increase my salary $100.00 per month, and give me one-half of one per cent override on all the business done by the company.'' Plaintiff was also to be elected a vice-president of the company. It was agreed that some minimum amount of business should be excepted from the commission rights of plaintiff, but at this meeting the exact amount of this minimum business was not agreed upon. Plaintiff suggested that the amount of business done between January 1st and May 1st be averaged, and that this figure be the amount to be excepted. Later Himes suggested that this figure be $40,000 per month, but this was unacceptable to plaintiff. The parties finally agreed that the figure should be $20,000 per month. Plaintiff testified that his commission was to attach to ''all business'' done by the company in excess of $20,000 per month. Plaintiff admitted that prior to this meeting the company had some aircraft business, but it is quite apparent that at that time such business was not very substantial.

At this point a fundamental distinction between the duplicator and the aircraft business of the company should be noted. In manufacturing stencils and other duplicators the company owned the materials, and owned the finished product. This product is sold to its customers. Thus, as to this business, an actual and legal sale took place. The aircraft business was of an entirely different nature. Defendant's plant was equipped to do machine work, and the machinery was peculiarly adapted to machining certain gear boxes to be installed on military aircraft. The desire of Himes was to secure, from the companies constructing the aircraft, subcontracts to machine these gear boxes. As to these contracts the aircraft company or the government furnished the materials, and the subcontractors, such as defendant, merely furnished the services of machining the product. Obviously, as to this work of the company there never was a ''sale'' in the legal sense.

The parties agreed that the arrangement arrived at April 23, 1943, should be reduced to writing. It is admitted that on May 1, 1943, plaintiff assumed his new duties under this arrangement, and his increased salary was paid from that

date. Various office memoranda were prepared by Himes informing the organization of the new setup and telling the staff that plaintiff was in full charge of all "sales." It is conceded that, from the time that this arrangement went into effect, until November 14, 1943, when plaintiff quit, contracts totaling over a million and a half dollars were secured from aircraft companies to machine gear boxes. Some of this work was done and some payments for such work were received by the company after plaintiff quit the employment. The basic question involved is whether plaintiff is only entitled to commissions where the work was completed and the aircraft companies billed for the work before November 14, 1943, or whether he is entitled to commissions for all work secured while he was sales manager, less $20,000 per month, even though the company did not finish the work or bill the aircraft companies until after that date. If the latter, the plaintiff has earned commissions in the amount found by the trial court.

The dispute arises because of the following facts: As already pointed out, it was agreed that the arrangement of April 23, 1943, was to be reduced to writing. This was done, and it is the interpretation of this contract that is here involved. Just when it was executed is a matter of dispute. The document is in the form of a letter to plaintiff from Himes as president of defendant and is dated May 1, 1943. It is signed "accepted" by plaintiff, and such acceptance is also dated May 1, 1943. The letter reads in part as follows:

"May 1, 1943

"Mr. R. Duff Willson
"126 Main Street
"San Francisco, California

"Dear Duff:

"Starting today your employment arrangement with the company will be changed.

"Up to this date you have been employed in the capacity of a line executive, as Director of Public Relations.

"Starting today you will become Sales Manager of Niagara Duplicator Co., a staff executive. You will be in charge of all company sales, selling, advertising, and public relations work, except as hereinafter provided and you will report to and be accountable to the President of the Company.

"Beginning today your base salary will be $500.00 per month, and you will be paid a sales commission of one-half of one

(.00-½%) per cent of company net sales in excess of $20,000.00 per month, or $240,000. per year.

"The above sales commission arrangement will become effective June 1, 1943, inasmuch as that date starts our company fiscal year.

"Your salary will be paid semi-monthly, one-half on the 15th and one-half on the last day of the month. Your sales commission will be accumulated on company records monthly, and will be reported and paid to you each month, within 20 days following the end of each month. It is of course understood that your salary and sales commission are subject to payroll taxes and deductions covering Federal, State, City, and other Governmental taxes, assessments and deductions.

". . . This employment arrangement is subject to cancellation by the president of the Niagara Duplicator Co. or by yourself at any time on 30 days written notice.

"Your signature at the place provided at the end of this letter will constitute your understanding and acceptance of the foregoing employment arrangement.

"NIAGARA DUPLICATOR CO.

"L. JOHN HIMES

"L. John Himes, President

"Accepted May 1, 1943:

"R. DUFF WILLSON

"R. Duff Willson

"LJH:heh"

The date this letter was delivered to plaintiff and signed by Himes and plaintiff is in dispute. Plaintiff testified that he did not receive it until June 30th or July 1st, and that the dates thereon did not truly reflect the date of its execution. Himes testified that the letter was prepared by him and delivered to plaintiff shortly after May 1, 1943, and that he received it back signed by plaintiff about two days thereafter. The then secretary of Himes, who had typed the letter, directly contradicted his testimony. She testified that the first draft of the letter was prepared about the middle of June, and that the final draft was not dictated until the "latter part of June." She further testified that the letter was dated back to May 1st on orders from Himes. Her dictation book would have disclosed the true date, but, although such book was subpoenaed, it was not produced by defendant, one of its witnesses testifying that it had been destroyed. The secre-

tary of Himes also testified that the May 1st letter was not delivered to plaintiff until a few days before plaintiff dictated to her a certain memorandum dated July 2, 1943. The trial court resolved this conflict in dates by finding in accord with the testimony of plaintiff and his witnesses.

The date the contract was actually executed becomes of vital importance because plaintiff produced the memorandum of July 2d, and it was signed by him but not by Himes. Plaintiff testified that this memorandum was delivered to Himes, and discussed with him, and an agreement reached as to the meaning of the May 1st agreement, before he, the plaintiff, signed the May 1st agreement. Himes vigorously denied this, but this conflict was resolved against defendant by the trial court. The internal structure of the memorandum supports plaintiff's testimony. The exact date the agreement was signed also becomes important because defendant secured, through plaintiff's efforts, during June of 1943, nearly a million dollars of aircraft contracts.

The trial court, over vigorous objections by defendant, admitted the memorandum into evidence as part of the same exhibit which included the May 1, 1943, letter. The theory of the trial court was that the May 1st letter and the July 2d memorandum had to be read together in order to understand what the parties actually intended about commissions payable to plaintiff. The memorandum reads as follows:

"Concord Calif.
"July 2, 1943

"Mr. L. John Himes
"Mr. R. Duff Willson

"Working Arrangement

"Dear John:

"I have the proposed new contract for my services dated May 1st.

"When we met in Los Angeles, at the time I took this position with you, I knew my ability to produce. You had, I thought, what it took to utilize that ability to produce. I made the remark in accepting your terms that it was 'quite a sacrifice' and you said, 'you produce the business and I'll take care of you,' or words to that effect. The same was repeated, in effect, at Larry's home when I accepted the additional responsibility of General Sales Manager and the promise of election to Vice-President. On your representation of the

business being done I too quickly accepted a small raise in pay (an amount still under that offered me by others) and from one per cent commission on my business to one-half per cent commission on all company business.

''. . . Now the commission 'on net sales over twenty thousand per month.' I find that while this amount and much more has been made in the past, the present picture is: 1. that the old stencils are finished with the completion of the Kaiser order—2. that we have no stencils for other orders which have come in—3. That there is an amount of aircraft business on contract obtained prior to May 1, 1943.

''I accepted the responsibility of introducing a New Stencil which will have to be *Sold* to old customers as well as to New Customers. Therefore, all business in New Stencils will be New Business.

''The proposed contract increases the scope of my services and responsibilities to the company for which I was getting one hundred dollars per month raise in salary. The proposed contract wipes out the one hundred dollars per month by limiting my commission to 'net sales in excess of twenty thousand dollars per month.' The proposed contract reduces my commission on business I have brought in so far more than four thousand dollars—is that mutual profit?

''More is required of R. Duff Willson and less money is received by R. Duff Willson for the extra effort and accomplishment.

''The next point of your letter to which I did not agree—A commission [in], my experience, is earned when the order is brought in and accepted by the company. In some instances, a commission is paid upon the acceptance of the order. In this instance, the commission should be paid when and as payments are received by the company.

''Last, but most important: One should be free to exert All of his efforts to Selling the Customer and Promoting the best interests of the company and in turn to expect his individual interests to be protected and fostered By the Company.

''I want my connection with the Niagara Duplicator Co., as reflected by this new contract, to do just that. I want a commission on all net sales of the company on orders accepted by the company on and after May 1, 1943. I want it stated that commissions are earned as soon as the company accepts the order. I want the commission on the amount of money collected by the company each month and paid to me on the

fifteenth of the following month. I hope we can see eye to eye on this.

> "Yours very truly,
> "R. Duff Willson

"heh"

It was stipulated that by November, 1944, and long before trial, the defendant had completed its work on all aircraft parts and other business contracted for during plaintiff's tenure as sales manager. The defendant has received full payment on all the contracts.

Plaintiff testified that Himes, about the end of June, 1943, dropped the letter of May 1st on his desk; that plaintiff read the letter and took it back to Himes and asked him to discuss some of its terms; that Himes told him that he did not want to discuss the problem orally, but that plaintiff should put his views into writing. It was in response to this invitation that plaintiff prepared the July 2d memorandum. Plaintiff testified that he delivered the memorandum to Himes; that Himes read it; that this was about July 2, 1943; that then he and Himes had a discussion; that Himes argued that the $20,000 limitation had to stand, and plaintiff finally agreed; that Himes insisted that commission payments had to be paid on the 20th and not the 15th, and plaintiff agreed to that; that then the parties discussed the question as to when the commissions were to be deemed earned under the contract; that plaintiff argued that his commissions must be considered earned when the defendant accepted the orders, and payable when the company was paid; that after he finished his argument Himes said: "We have nothing to argue. It is covered in the contract." On cross-examination plaintiff clarified this by testifying that Himes conceded that the commissions, under the contract, were to be deemed earned as soon as the orders were accepted by the company. This was denied by Himes, but again this conflict was resolved against defendant by the trial court. Plaintiff testified that after the parties had so agreed he signed the May 1st agreement.

There is no dispute that plaintiff worked under the contract until November 14, 1943, when he resigned, having given a 30-day notice to that effect on October 14, 1943. There is no dispute that contracts in the amounts found by the trial court were secured by defendant during the period plaintiff acted as sales manager. There is no dispute that defendant paid plaintiff his salary as provided in the May 1st agreement, and

paid him commissions on all work billed to customers over $20,000 per month up to November 14, 1943. The dispute is over commissions on sums received by the company between November, 1943, and November, 1944, for work contracted for while plaintiff was sales manager, but not completed until that employment had been terminated.

█ It is at once obvious that if plaintiff's oral and written evidence were admissible to explain the true meaning of the expression "company net sales" as used in the May 1st agreement, such parol evidence supports the trial court's finding that such commissions were earned as soon as contracts were accepted by defendant. Appellant urges, however, that all such evidence violated the parol evidence rule. It contends that the contract of May 1st is clear on its face and unambiguous, and that the proffered testimony did not interpret but "changed" the meaning of the terms of that agreement. It is also urged, as part of the same basic contention, that there is no evidence to support the finding that the May 1st and the July 2d documents constituted but a single contract.

The contentions of defendant on these points are without merit. The trial court found, and the finding is supported, that, before the May 1st agreement was signed, Himes represented to plaintiff that the May 1st letter was intended to express, in reference to commissions, the meaning expressed in the July 2d memorandum; that Himes represented that the May 1st agreement provided that commissions should be payable on the basis of contracts made, and that it was unnecessary to alter the May 1st agreement to so provide because it already so provided. It was also found that these representations were made with intent to mislead plaintiff and to induce him to sign the May 1st letter; that plaintiff acted on such misrepresentations and signed the letter; that defendant intended plaintiff to believe, and plaintiff did believe, that the letter and memorandum were one contract; that plaintiff was led to believe that the phrase in the May 1st letter "company net sales" referred to all contracts accepted by defendant as orders during his employment. As to these last findings defendant is faced with a dilemma. If the defendant fraudulently deceived the plaintiff as to the meaning of the letter, then the judgment may be sustained on that theory. If the defendant was not fraudulent, but made the representations testified to by plaintiff in good faith, then the parties agreed as to the meaning of the contract and evidence of such intended meaning is, of course, admissible. If the

phrase "company net sales" referred only to "sales" in the technical sense, then plaintiff could have earned no commissions at all because the company was almost entirely engaged in machining parts for aircraft and none of that business involved a "sale." Defendant contended that the phrase meant—business billed each month to the customers—but had to resort to parol evidence to support this interpretation.

If, for the moment, the competency of the evidence offered by the plaintiff be assumed, it is obvious from the summary of the evidence, *supra,* that the finding that the two documents were intended as a single contract is amply supported. It is also apparent, under the same assumption, that the finding as to the intent of the parties as to the meaning of the phrase in question is also amply supported. ▮ The only real question is whether the evidence is admissible. Again the defendant finds itself on the horns of a dilemma. If the defendant intended the phrase "company net sales" to have the meaning contended for by it, then defendant was fraudulent, and parol evidence is admissible to show such fraud. Section 1856 of the Code of Civil Procedure, after first setting forth the parol evidence rule, provides: "But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section 1860, [permitting evidence of surrounding circumstances] or to explain an extrinsic ambiguity, or to establish illegality or fraud. . . ."

Section 1640 of the Civil Code expresses the same rule even more forcefully. It provides that: "When, through fraud, . . . a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded."

On the other hand, if there was no fraud, then, under the evidence, the two documents must be read together, and, so read, they either have the effect of establishing plaintiff's interpretation, or, to say the least, there is an apparent and obvious ambiguity on the face of the contract, so that parol evidence was admissible to interpret it. Section 1856 of the Code of Civil Procedure provides that, except in cases of mistake or imperfection of the agreement, or where the validity of the agreement is in fact in dispute, "no evidence of the terms of the agreement other than the contents of the writing" is admissible, but that "this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates as defined in section

1860." This last-mentioned section provides: "For the proper construction of an instrument the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

In *Wells* v. *Wells*, 74 Cal.App.2d 449, 456 [169 P.2d 23], the court stated: "The function of all interpretation is, of course, to try to ascertain the true intent of the parties. Parol evidence should not be admitted to vary, to add to, or to subtract from the terms of a written agreement, but it should be, and is admissible, to explain what the parties meant by what they said."

In the present case if the phrase "company net sales" be considered entirely unrelated to the transaction to which it was intended to apply, it would mean that the plaintiff would be entitled to no commissions at all because the very business that the contract was intended to cover did not result in a sale. Once the surrounding circumstances are shown, it is at once apparent that the commissions were either intended to apply to contracts secured, or to work done under each contract. That is an ambiguity. Such ambiguity, appearing on the face of the instrument, permits the introduction of parol evidence. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.*, 20 Cal.2d 751 [128 P.2d 665]; *Wells* v. *Wells, supra*; *Estate of Rule*, 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319]; *Jegen* v. *Berger*, 77 Cal.App.2d 1 [174 P.2d 489]; *Estate of Gaines*, 15 Cal.2d 255 [100 P.2d 1055]; *Payne* v. *Commercial Nat. Bank*, 177 Cal. 68 [169 P. 1007, L.R.A. 1918C 328].) The challenged evidence was clearly admissible.

█  This disposes of the main question presented on this appeal. Defendant next makes a technical argument about the findings, and contends that, in certain respects, the findings are conflicting and do not support the conclusions of law and the judgment. This somewhat obscure argument is apparently based upon the fact that the trial court found that on April 23, 1943, plaintiff's contract of employment was revised, and that, under the revised agreement, plaintiff was to receive the salary of $500 per month with a commission of one-half of 1 per cent on all company business in excess of average during the period January 1 to May 1, 1943. It was also found that plaintiff accepted the employment, and that such employment terminated on November 14, 1943. These findings, defendant contends, are contrary to

the findings and conclusions relating to the contract dated May 1, 1943. The court did not find, as is assumed by defendant, that the employment continued until November 14, 1943, under the agreement of April 23, 1943, alone. There is no room for doubt that the court found, and that the evidence shows, that the April 23, 1943, conference and agreement fixed the general outline of the new job, and that the letters of May 1st and July 2, 1943, clarified the arrangement as to when commissions should be deemed earned. The findings and conclusions and judgment are not in conflict.

The contention that, since the written contract was not executed until July 2, 1943, the commission agreement could not apply to the contracts secured in June, 1943, totaling over $900,000, is without merit for the obvious reason that Himes' letter dated May 1, 1943, expressly states that the commission arrangement applies as of June 1, 1943.

Defendant next makes an argument that is somewhat difficult to follow. Defendant states that "Because during his employment as sales manager respondent [plaintiff] contributed in a measure to all sales, this minimum [$20,000 per month or $240,000 per year] was and should have been deducted from *all* of appellant's [defendant's] net sales. But after respondent resigned, if respondent was entitled to any commission, a fact which appellant denies, this minimum should have been deducted from the sales which resulted from orders accepted *during respondent's employment* rather than from appellant's net sales resulting from orders accepted after respondent left its employ." (App.Op.Br., p. 19.) It is then contended that the finding that the company collected after November 14, 1943, on contracts accepted while plaintiff was employed, a total of $828,526.79, should be reduced by $240,000, which is 12 times $20,000. The argument begs the basic question on this appeal. Once it was determined that plaintiff earned his commissions on all contracts accepted during his employment, less, of course, $20,000 per month during those periods, payable when the money was collected, it was necessarily determined that the minimum deduction was not referable to the actual receipt of the money, but to the period during which the orders were accepted by defendant. The trial court found, and this finding is not challenged, "that on or before November 14, 1943, plaintiff received payment of all commissions which had then become due on billings for general sales of merchandise and for billings to the companies affected under aircraft orders then out-

standing; that in making payment for commissions up to this date, defendant made a full deduction at the rate of $20,000 per month before figuring commissions to plaintiff.'' Thus, for the purpose of figuring commissions prior to November 14, 1943, commissions which defendant admits were due to plaintiff, and which constituted part payment on the commissions on contracts secured prior to November 14, 1943, the defendant deducted the $20,000 monthly minimum. Since the $20,000 deductions had already been made on these contracts, it would have been improper to have duplicated them for the period subsequent to November 14, 1943.

The last contention of defendant is that the trial court failed to find on a material issue raised in the answer of defendant. In its answer defendant had alleged that the written contract of employment had been ''cancelled and terminated as of November 14, 1943, by an agreement in writing between plaintiff and defendant.'' That ''agreement'' was attached to the answer as an exhibit, and was introduced into evidence during the trial. It is the letter of resignation signed by plaintiff and addressed to Himes and is dated October 14, 1943. The letter first states that plaintiff is giving the 30-day required notice of termination, and then states:

''It is understood that I will be paid my commission on all billings up to and including the 14th day of November and that a complete settlement including salary and receipt for income tax withheld will be affected as of that date.

''Your signature at the bottom of this letter will constitute our agreement in the above.'' It is marked ''accepted'' with Himes' signature, dated October 14, 1943. It is urged that this letter amounted to a settlement, and that under it plaintiff agreed that he was only entitled to commissions on billings to customers where the billings were mailed prior to November 14, 1943. The trial court made no finding as to the proper interpretation of this letter because the trial court found that:

''. . . said letter was delivered by plaintiff to L. John Himes, the president of defendant company, to be retained for counter-signature in case such action became necessary to enable plaintiff to obtain a manpower clearance under wartime regulations then in force; that Himes received the original and copy of said letter in accordance with an express understanding to that effect; and that at the date of delivery thereof, plaintiff notified defendant of his intention to claim further commissions, based upon moneys thereafter received by de-

fendant upon aircraft contracts accepted as orders, during the course of plaintiff's employment.

"The court further finds that on or about November 1, 1943, plaintiff ascertained that no manpower clearance would be necessary to enable him to seek other employment, and that he then and there advised said Himes to that effect, and notified the latter that the provisions of said letter were revoked."

The court also found that after plaintiff delivered the letter to Himes he did not receive it back from Himes marked "accepted" until November 15, 1943, which was "after defendant had been notified by plaintiff of the revocation thereof." Thus, the trial court did not find on the alleged defense because the court found, by necessary implication, that the offer of October 14, 1943, if it be deemed an offer, was revoked before it was accepted. Defendant urges that there is no evidence to support such a finding, and quotes certain evidence on the issue which certainly does not support the finding. Defendant has apparently completely overlooked very positive testimony that supports the finding. Plaintiff testified that the letter of October 14th was written in order that he would not be "frozen" into his position by reason of certain wartime regulations, but that he learned prior to October 30th that such regulations did not apply to him; that he thereupon telephoned to Himes and told him the regulations were inapplicable to him and that he was "withdrawing" the letter of October 14th; that he had not then received back the countersigned letter; that when he delivered it to Himes he was told by Himes that he "would not act on it or accept it"; that when he told Himes that he was withdrawing the letter, Himes told him that he would see him two days later, but that Himes failed to keep the appointment; that on November 12th he next saw Himes and was then told by him that Himes had "accepted" the resignation, and that a few days later the countersigned letter was delivered to him. (R. T., pp. 81-83.) Thus, even if the letter be construed as an offer to settle the controversy over commissions (and we gravely doubt whether it can or should be so construed), it is apparent that the quoted finding is amply supported, and that by necessary implication the "offer" was revoked before it was "accepted."

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.